UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA P., | Case No.: 19cv1321-CAB(RBB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 11, 12]** |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

On July 16, 2019, Plaintiff Teresa P.[1] commenced this action against Defendant
Andrew M. Saul, Commissioner of Social Security, for judicial review under 42 U.S.C.
section 405(g) of a final adverse decision for social security benefits [ECF No. 1].
Defendant filed the Administrative Record on September 20, 2019 [ECF No. 7].  On
October 25, 2019, Plaintiff filed a motion for remand for payment of benefits or, in the
alternative, remand for further administrative proceedings [ECF No. 10].  The
Commissioner filed a cross-motion for summary judgment and an opposition to

---

[1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local
Rules.  See S.D. Cal. Civ. R. 7.1.e.6.b.

1

Plaintiff's motion for remand on November 22, 2019 [ECF No. 12]. Plaintiff did not file a reply.

The Court has taken the motions under submission without oral argument [ECF No. 8]. For the following reasons, the Court recommends that Plaintiff's motion for remand be **GRANTED IN PART** and **DENIED IN PART**, that Defendant's cross-motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**, and that the case be remanded for further proceedings.

## I.     BACKGROUND

On November 2, 2015, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act. (Admin. R. 90, 183-84, ECF No. 7.) [2] Plaintiff alleged that she has been disabled since July 2, 2015, due to rheumatoid arthritis. (Id. at 183, 234.) Her application was denied on initial review and again on reconsideration. (Id. at 114-17, 120-24.) An administrative hearing was conducted on April 9, 2018, by Administrative Law Judge ("ALJ") Jay E. Levine, who determined on July 27, 2018, that Plaintiff was not disabled. (Id. at 42-51.) Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied the request for review on May 24, 2019. (Id. at 1-4.) Plaintiff then commenced this action pursuant to 42 U.S.C. section 405(g).

**A.     Medical Evidence**

According to the medical evidence in the record, Plaintiff first became aware that she had rheumatoid arthritis in November 2007, when she reported to her primary care provider, Dr. Yenny Lim, that she was experiencing pain, swelling, and stiffness in her

---

[2] The administrative record is filed on the Court's docket as multiple attachments. The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.

knuckle, wrist, hands, and elbow. (Id. at 438.) Teresa P. told Dr. Lim that she was very physically active, lived on a farm with her significant other, and took care of many animals that required her to perform work such as lifting bales of hay. (Id.) She also complained of daily headaches and monthly migraines, and stated that she took Imitrex for her migraines when necessary. (Id.) At Dr. Lim's recommendation, Plaintiff was evaluated by Dr. Edward Skol, a rheumatologist, on January 2, 2008. (Id. at 425.) Dr. Skol noted Plaintiff's three-month history of multiple-joint pain and her strong family history of rheumatoid arthritis. (Id.) Dr. Skol suspected early rheumatoid arthritis; he prescribed methotrexate and started a temporary trial of prednisone to provide Teresa P. with relief while waiting for the methotrexate to take effect, which could take up to three months. (Id. at 434.) An anti-CCP antibody test confirmed Plaintiff's rheumatoid arthritis. (Id. at 431.)[3] Plaintiff continued to be seen by Dr. Skol through July 2009, (id. at 386-94, 400-17), and, for insurance reasons, she switched her care to Dr. Puja Chitkara from October 2009 until December 2010 (id. 526-39).

In 2011, Teresa P. began treatment with Dr. Stacey Schulman, a rheumatologist, (id. at 473-76), and was seen on an annual basis until 2015 (id. at 447-53, 466-72). On July 2, 2015, Plaintiff came in for an urgent visit with complaints of a generalized arthritis flare. (Id. at 310-13.)[4] Dr. Schulman noted Plaintiff's longstanding CCP antibody positive rheumatoid arthritis had been managed by a combination therapy that included Simponi injections, methotrexate, and nonsteroidal anti-inflammatory drugs ("NSAIDs"). (Id. at 310.) Teresa P. described aching and stiffness in her hand joints, wrists, shoulders, knees, and ankles, and her pain level was at nine to ten on a scale of

---

[3] Anti-cyclic citrullinated peptide ("anti-CCP") antibody testing is used to diagnose rheumatoid arthritis. U.S. National Library of Medicine, https://pubmed.ncbi.nlm.nih.gov/17434910-anti-ccp-antibody-testing-as-a-diagnostic-and-prognostic-tool-in-rheumatoid-arthritis/ (last visited Feb. 13, 2020).
[4] The terms "flare" and "flare-up" are used interchangeably throughout the record. The Court adopts this practice and will use both terms in this Report and Recommendation.

ten.  (Id.)  Plaintiff explained that she had worked at the YMCA for the last twelve years and felt that the physical demands and stress level of her job were contributing to her symptomatology.  (Id. at 310-11.)  She also stated that she had been coping with worsening pain over the last five years that had become unbearable in the last six months, and she felt she needed to be placed on medical leave.  (Id. at 311.)  Upon examination, Plaintiff had positive impingement signs at both shoulders; synovitis at the right elbow, right wrist, finger joints, and left ankle; decreased grip strength; trace effusion of the right knee; bilateral knee crepitation; and tenderness to the left foot.  (Id. at 312.)[5]  Dr. Schulman placed Teresa P. on medical leave, prescribed prednisone, and increased her dosage of methotrexate.  (Id.)

The following month, Plaintiff reported to Dr. Schulman that the prednisone had calmed her symptoms and she had benefited from being out of her work environment, but still had significant pain.  (Id. at 307.)  Plaintiff improved over the following months with more aggressive medical management, including an increased dose of methotrexate.  (Id. at 303, 304, 306.)  She continued to experience residual symptoms and had trace synovitis in her right wrist and elbow, tenderness in her finger joints, and crepitation of the right knee.  (Id. at 302.)  In November 2015, Dr. Schulman continued Teresa P.'s short-term disability leave through May 2016.  (Id. at 303, 377-79.)  In January 2016, Plaintiff told Dr. Schulman that she felt she had "turned the corner and [was] going in the right direction."  (Id. at 299.)  Nonetheless, she still had limitations in her daily activities and a pain level of three to four on a scale of ten, particularly toward the end of her monthly Simponi injection cycle.  (Id. at 298.)  Dr. Schulman noted bilateral knee

---

[5] According to the Merriam-Webster online medical dictionary, "synovitis" is "inflammation of the synovial membrane."  Merriam-Webster, https://www.merriam-webster.com/dictionary/synovitis (last visited Feb. 13, 2020).  "Effusion" is defined as escaped fluid.  Id., https://www.merriam-webster.com/dictionary/effusion (last visited Feb. 13, 2020).  "Crepitation" is a crackling sound.  Id., https://www.merriam-webster.com/dictionary/crepitation (last visited Feb. 13, 2020).

crepitation and trace synovitis in Teresa P.'s right wrist and finger joints but found that her condition had objectively improved.  (Id. at 299.)

On April 4, 2016, state agency physician Dr. K. Vu determined that Plaintiff had the residual functional capacity to lift or carry twenty pounds occasionally and ten pounds frequently; to stand, walk, or sit for six hours in an eight-hour workday; and was limited in her ability to push or pull.  (Id. at 95-96.)  Dr. Vu also found that Teresa P. had postural and manipulative limitations, including a limitation in her handling and fingering abilities.  (Id. at 96-97.)  On July 27, 2016, state agency physician Dr. B. Harris adopted Dr. Vu's residual functional capacity assessment.  (Id. at 107-09.)

On April 26, 2016, Plaintiff's treating physician, Dr. Schulman, provided an assessment of Plaintiff's residual functional capacity.  (Id. at 355-59.)  In contrast to the state agency physicians, Dr. Schulman opined that Plaintiff could stand or walk for less than two hours in an eight-hour workday, sit for two hours, would need a ten to twenty minute break three to four times per day, and could never lift more than ten pounds.  (Id. at 357.)  She found that Plaintiff had significant limitations in reaching, handling, and fingering and could only perform such activities fifteen percent of the time in an eight-hour workday.  (Id. at 358.)  She further indicated that Teresa P. would be absent from work more than four days per month.  (Id.)  Plaintiff's clinical findings and objective signs included positive CCP antibody, synovitis, and intermittently elevated ESR and CRP tests.  (Id. at 355.)[6]  Dr. Schulman indicated that Plaintiff was incapable of even "low stress" jobs because stress aggravated her arthritis symptoms.  (Id. at 356.)

---

[6] Erythrocyte sedimentation rate (ESR) and C-reactive protein (CRP) level are the most widely used tests to monitor and detect inflammatory disorders.  NEJM Journal Watch, https://www.jwatch.org/hm201010250000001/2010/10/25/which-inflammatory-marker-should-we-measure-esr (last visited Feb. 13, 2020).

In February 2017, Dr. Schulman reported that Plaintiff had started taking Orencia in place of methotrexate and Simponi, and she was doing much better.  (Id. at 549.) Although Plaintiff stated that she was still experiencing flares of her joint symptoms, they had not been as severe.  (Id.)  Her pain level fluctuated between three and six out of ten. (Id.)  Dr. Schulman discussed adding a second agent to Teresa P.'s medical management. (Id. at 550.)  On April 20, 2017, Dr. Schulman completed a disability form in which she indicated that Plaintiff was "unable to work."  (Id. at 374-76.)  In May 2017, Dr. Schulman added low-dose Arava (leflunomide) to Plaintiff's existing medications, Orencia and ketoprofen (an NSAID), because Plaintiff continued to experience symptoms in her wrists, feet, and sometimes knees.  (Id. at 481-82.)  Plaintiff reported that she experienced thirty minutes of morning stiffness and limited her daily activities due to her joint pain.  (Id. at 482.)  Upon examination, Teresa P. exhibited bilateral knee crepitation, "slight widening at the right wrist . . . but not red or tender, trace widening of the left wrist, and mild tenderness" in the finger and foot joints.  (Id. at 484-85.)

On August 3, 2017, Plaintiff decided to discontinue Arava because of its side effects, although she had not had any significant flares since her last visit.  (Id. at 493-94.)  Dr. Schulman considered that there was possibly a component of myofascial pain contributing to Teresa P.'s symptomology and prescribed a trial of Lexapro.  (Id.)  When Plaintiff saw Dr. Schulman in November 2017, she reported that she had discontinued taking Lexapro because she found it to be ineffective and declined to try any other medications for her dysthymia.[7]  (Id. at 507.)  Dr. Schulman prescribed azathioprine, to use in combination with Orencia, which Plaintiff felt was effective but which did not

---

[7] Dysthymia is defined in the Merriam-Webster online medical dictionary as "a mood disorder characterized by chronically mildly depressed or irritable mood often accompanied by other symptoms (such as eating and sleeping disturbances, fatigue, and poor self-esteem)."  Merriam-Webster, https://www.merriam-webster.com/dictionary/dysthymia (last visited Feb. 13, 2020).

completely control her symptoms. (Id. at 507-08.) In January 2018, Teresa P. reported that she had not had much improvement since adding azathioprine, and her symptoms, including pain in her finger joints, had flared with weather changes. (Id. at 519.) Dr. Schulman completed a disability form in which she indicated that Plaintiff was "unable to work at present time." (Id. at 382-84.)

Plaintiff saw a new rheumatologist, Dr. Monica Budianu, in February 2018. (Id. at 542-48.) Dr. Budianu found no active synovitis but noted that Plaintiff reported frequent flares of her rheumatoid arthritis two to three times per month. (Id. at 542.) Dr. Budianu recommended that Teresa P. increase her azathioprine slightly for better arthritis control, and prescribed prednisone three to five days at a time in case of an arthritis flare. (Id.) For Plaintiff's migraines, Dr. Budianu recommended that Teresa P. discuss preventative medicine with her primary care provider since Imitrex appeared to cause flares in her rheumatoid arthritis. (Id.) Plaintiff stated her pain level was five to six out of ten on average, and up to eight or ten at times. (Id. at 543.) Plaintiff informed Dr. Budianu that she used ibuprofen, ketoprofen, Flector patches, heat, and Tylenol with codeine to manage her pain. (Id.)

Dr. Megan Lynch, a rheumatologist, completed a medical report on September 21, 2018, after the ALJ's decision. (Id. at 30-33.) She opined that Plaintiff could sit, stand, or walk for one hour in an eight-hour workday; lift, carry, push, or pull only up to ten pounds intermittently; and was unable to work at the present time. (Id. at 32-33.)

**B.   Hearing Testimony**

On April 9, 2018, Teresa P. appeared with her attorney at a hearing before ALJ Levine. (Id. at 56.) Plaintiff testified that she was fifty-nine years old and had worked for twelve years as a director in the food service department at the YMCA. (Id. at 59-60.) She managed eighteen employees and ordered the supplies needed to serve three meals a day to three hundred children. (Id. at 60.) Vocational expert ("VE") Kathleen Macy-

7

Powers testified that the Dictionary of Occupational Titles classified a director of food services as light work, but based on her description of her job duties, Plaintiff performed her job at a heavy level of exertion because she typically lifted up to seventy-five pounds. (Id. at 62.) Teresa P. testified that she stopped working in 2015 because her rheumatoid arthritis had progressed so much that she "was literally unable to walk across the kitchen" at work and would sometimes go into her office to rest. (Id. at 62-63.) Her rheumatoid arthritis is most painful in the bottom of her feet and in her hands, and also flares up in her knees, elbow, and back. (Id. at 63.) She experiences flare-ups every week that last three to five days. (Id. at 64.)

Teresa P. testified that she and her wife own a home on five acres of land. (Id. at 66.) She described her typical day as doing "a lot of sitting down and resting in[] between short intervals of doing things." (Id.) She takes care of the cat and the chickens and walks to visit the horses when her "feet aren't so bad." (Id.) Plaintiff stated that she is able to sustain fifteen to twenty minutes of activity before needing to rest. (Id. at 69.) She rests by putting her feet up in a recliner because this helps her rheumatoid arthritis to calm down. (Id.) She rests for thirty to forty minutes before moving on to the next task of the day. (Id. at 70.) Teresa P. does not perform any activities on the days she has flares; instead, she spends nine to ten hours reclining or lying down. (Id.) Plaintiff testified that her wife retired early in order to help her at home. (Id. at 72.) Plaintiff used to be very active and went camping and hiking. (Id. at 73.) She previously rode her horse every weekend for two to three hours but had not been able to get on her horse since 2013. (Id.)

Teresa P. testified that she suffers from migraines, which are brought on by stress and worry, at least once every two weeks. (Id.) She testified that when she was first diagnosed with migraines, she tried many medications and found that only Imitrex provided relief. (Id. at 65.) When she takes Imitrex, however, it causes her rheumatoid

8

arthritis to flare up.  (Id.)  Her migraines last thirty minutes to an hour.  (Id. at 75.)  She testified that she used to have "cluster" migraines when she was working because "the job was enormously stressed" but had not had cluster migraine headaches since she stopped working.  (Id. at 76.)  After a migraine, her brain feels "bruised" and she cannot think or function normally for two days.  (Id. at 77.)  On days on which she does not have an arthritic flare, she is able to crochet or otherwise use her hands for forty-five minutes to an hour before they become stiff, and then she has to rest them for two to three hours before starting back up again.  (Id. at 79-80.)  Plaintiff testified that she has difficulty concentrating and multitasking is very difficult for her.  (Id. at 82-84.)

The ALJ did not have any questions for the VE during the hearing.  (Id. at 85.)  In response to questioning by Plaintiff's counsel, the VE testified that the acceptable level of absenteeism in a skilled level position such as Teresa P.'s prior job would be no more than one-and-a-half days per month.  (Id. at 86.)  The VE also stated that there would not be any jobs in the national economy in significant numbers for a person of Plaintiff's profile who was limited to sedentary work and using her hands for only fifteen percent of the workday.  (Id. at 87.)  Additionally, a person requiring unscheduled breaks three to four times per day would not be able to perform Teresa P.'s past work or any other work. (Id.)

**C.**    **ALJ's and Appeals Council's Decisions**

On July 27, 2018, the ALJ issued a decision finding that Teresa P. had not been under a disability, as defined in the Social Security Act, from her alleged onset date through the date of the decision.  (Id. at 42-51.)  ALJ Levine stated that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020.  (Id. at 44.)  He also determined that Plaintiff had not engaged in substantial gainful activity since July 2, 2015, the alleged onset date.  (Id.)  The ALJ found that Teresa P.'s rheumatoid arthritis was a severe impairment, but her migraine headaches were not

severe.  (Id. at 44-45.)  The ALJ found that, singly or in combination, Plaintiff did not

have impairments that met or medically equaled a listing.  (Id. at 45-46.)  He further

determined that Teresa P. had the residual functional capacity to perform the full range of

light work.  (Id. at 46-50.)  The ALJ concluded that Plaintiff could perform her past

relevant work as a director of food services.  (Id. at 50-51.)

On August 20, 2018, Plaintiff requested that the Appeals Council reconsider the

ALJ's decision.  (Id. at 181-82.)  She provided Dr. Lynch's September 21, 2018 report as

additional medical evidence.  (Id. at 30-33.)  On May 24, 2019, the Office of Appellate

Operations notified Teresa P. that the Appeals Council had denied her request for review.

(Id. at 1-6.)  The Appeals Council found that Dr. Lynch's report did not show a

"reasonable probability that it would change the outcome of the decision."  (Id. at 2.)[8]

## II.    LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful

applicants to seek judicial review of a final agency decision of the Commissioner.  42

U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited,

however, and the denial of benefits "'will be disturbed only if it is not supported by

substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human

Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529

(9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014).

Substantial evidence means "'more than a mere scintilla but less than a preponderance; it

is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews

---

[8] Plaintiff states that she reapplied for Title II disability insurance benefits after the Appeals Council denied her request for review, and in a notice dated October 19, 2019, she was found by the SSA to be disabled as of May 25, 2019, with an entitlement to monthly benefits starting in November 2019.  (Pl.'s Mot. & Mem. Supp. Compl. ["Pl.'s Mem."] 6 & Attach. #1 [Ex. A], ECF No. 11.)

v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, an applicant must show two things:  (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the

claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

## III.    DISCUSSION

Plaintiff argues that the ALJ's step two, residual functional capacity, and step four determinations were not supported by substantial evidence; that the ALJ improperly assessed and rejected the opinions of her treating physicians; and that the ALJ improperly rejected her testimony.  (Pl.'s Mem. 6-28, ECF No. 11.)[9]

## A.    Step-Two Severity Finding

Plaintiff contends that the ALJ erred in his determination that her migraine headaches were not a "severe" impairment at step two of the disability evaluation.  (Id. at 8-9.)  In doing so, she points out that her history of migraine headaches is documented throughout the record.  (Id. at 9.)  Defendant argues in response that Plaintiff's clinical findings and treatment history constitute substantial evidence supporting the ALJ's finding that the migraines were not a severe impairment.  (Def.'s Mot. Attach. #1 Mem.

_____

[9] The Court addresses Plaintiff's arguments in a slightly different order than as presented in her motion.

Supp. Summ. J. 8, ECF No. 12.)  Defendant also observes that Plaintiff does not identify any migraine-related functional limitations contained in the record.  (Id.)

In order to be found disabled, a disability claimant must have a "severe" impairment.  20 C.F.R. § 404.1520(c).  A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities . . . ."  Id.  "Basic work activities" include, among other abilities and aptitudes, walking, standing, sitting, and carrying or handling; understanding, carrying out, and remembering simple instructions; using judgment; and dealing with changes in a routine work setting.  SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985).  The requirement that an impairment be severe "allow[s] the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working."  Id. at *2 (citation omitted).  In other words, step two consists of a "de minimus screening device" used to dispose of groundless claims.  See Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987); Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

In this case, the ALJ determined that Plaintiff's rheumatoid arthritis was "severe" but her migraine headaches were "nonsevere" at step two.  (Admin. R. 44-45, ECF No. 7.)  ALJ Levine found that Plaintiff's migraines were nonsevere because the record did not contain any "objective evidence that symptoms from [her] migraine headaches have objectively caused more than minimal limitations in her ability to perform work-related activities . . . ."  (Id. at 45.)  While the medical evidence supports that Teresa P.'s medical doctors diagnosed and prescribed medication for her migraines, the ALJ could properly find that the migraines did not significantly limit her ability to perform basic work activities.  The records are devoid of any indication that Plaintiff required medical treatment during any of her migraines, and there are no objective findings in the record revealing any migraine-related diagnostics.  "[W]hile there may not be a laboratory or blood test to confirm a migraine disorder, and it may be that radiologic studies do not

13

19cv1321-CAB(RBB)

always reveal an objectively-defined source of migraine pain, it is possible to present objective-like evidence to establish the severity of the claimed impairment . . . ." Mehrnoosh v. Astrue, No. CV-10-52-HZ, 2011 WL 2173809, at *7 (D. Or. June 2, 2011) (citing Ortega v. Chater, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996)). For example, a treating doctor's observations of any physical manifestations of pain, trips to the emergency room or hospital admissions for disabling migraine pain, or treatment notes reflecting medical signs and symptoms such as nausea, vomiting, dizzy spells, blackouts, or photophobia can establish the severity of a disabling migraine condition. See Mehrnoosh, 2011 WL 2173809, at *7. No such evidence is contained in Plaintiff's medical records. Therefore, the Court finds that the ALJ could properly determine that Plaintiff 's migraines were not severe at step two of the five-step disability analysis.

## B.  **Treating Physician Opinions**

Plaintiff argues next that the ALJ and the Appeals Council improperly assessed and rejected the opinions of treating physicians Dr. Schulman and Dr. Lynch. (Pl.'s Mem. 17-25, ECF No. 11.) Specifically, she contends that the ALJ did not provide specific and legitimate reasons to reject Dr. Schulman's opinion, (see id. at 18-24), and that the Appeals Council improperly found that Dr. Lynch's evaluations did not "show a reasonable probability that it would change the outcome" of the ALJ's decision, (see id. at 24-25). Defendant counters that the ALJ reasonably found that the medical evidence did not support the functional limitations assessed by Dr. Schulman and better comported with Dr. Vu's and Dr. Harris's opinions that Plaintiff could perform light work. (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 13-14, ECF No. 12.) Defendant also contends that the Appeals Council properly found Dr. Lynch's opinion immaterial because it post-dated the ALJ's decision. (Id. at 14-15.)

Generally, a treating physician's opinion is given more weight by the SSA than a nontreating physician's opinion. 20 C.F.R. § 404.1527(c)(2) (2019).[10] A treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Id. When the treating source's medical opinion is not given controlling weight, the following factors are considered: length of the treatment relationship and the frequency of examination, and whether the physician has "obtained a longitudinal picture" of the claimant's impairment; the nature and extent of the treatment relationship, and whether the treating source has "reasonable knowledge" of the claimant's impairment; supportability of the medical opinion; consistency of the opinion with the record as a whole; the physician's specialization; and other factors. Id., § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). A finding that a treating physician's medical opinion should not be accorded "controlling weight" does not mean that the opinion is rejected. Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Id. at 632.

If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject the opinion only by articulating "clear and convincing" reasons supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). If the treating physician's opinion is contradicted by another doctor, the ALJ may reject the opinion of the treating physician only by giving "specific and legitimate" reasons for doing so that are based on substantial evidence in the record. Id. (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). When a nontreating physician relies on the

---

[10] The evaluation of opinion evidence is set forth in 20 C.F.R. § 404.1527(c)(2) for claims, such as Plaintiff's, filed before March 27, 2017. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply. See 20 C.F.R. § 404.1527 (2019); 20 C.F.R. § 404.1520c (2019).

same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the nontreating physician are not considered "substantial evidence." Orn, 495 F.3d at 632. By contrast, when a nontreating physician provides "'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" Id. (citations omitted). Independent clinical findings can consist of either (1) diagnoses that differ from those provided by another physician and that are supported by substantial evidence or (2) findings based on objective medical tests that the treating doctor has not considered. Id. (citing Andrews, 53 F.3d at 1041). A contradictory opinion by a nonexamining physician alone does not constitute substantial evidence. Lester, 81 F.3d at 831; Magallanes v. Bowen, 881 F.2d 747, 752 (9th Cir. 1989.

### 1. Dr. Schulman

Here, the ALJ stated the following regarding the opinions of Plaintiff's treating rheumatologist, Dr. Schulman:

> Dr. Schulman's opinions are given little weight because they are inconsistent with Dr. Schulman's own records, as well as those of another rheumatologist, that show the claimant's symptoms were progressively improving after the rheumatoid arthritis flare that she saw Dr. Schulman for on July 2, 2015, and these records also show the claimant's symptoms remained relatively mild for the most part if she was able to remain medication compliant and without stressful exacerbations in her life [exhibit references omitted]. Further, determination of disability is ultimately reserved for the Commissioner of Social Security [citation omitted].

(Admin. R. 50, ECF No. 7.)

The Court finds that the ALJ failed to give Dr. Schulman's opinions sufficient weight and that her opinions should have been accorded significant, if not controlling, weight. Even assuming that the ALJ properly could properly find that Dr. Schulman's opinions were not entitled to controlling weight, the factors set forth in 20 C.F.R.

§ 404.1527(c) should have led the ALJ to grant more weight to Dr. Schulman's opinions than he did. Dr. Schulman was Teresa P.'s treating rheumatologist over the course of seven years, and she treated Plaintiff both before and after Plaintiff alleges her rheumatoid arthritis stopped her from working. Teresa P.'s doctor therefore "obtained a longitudinal picture" of Plaintiff's impairments that the nonexamining physicians, Drs. Vu and Harris, did not possess. 20 C.F.R. § 404.1527(c)(2)(i). Given that she was a rheumatologist treating Plaintiff for a condition within her specialty, Dr. Schulman had "reasonable knowledge" of Plaintiff's rheumatoid arthritis complaints as contemplated by § 404.1527(c)(2)(ii) as well as the "specialization" discussed in § 404.1527(c)(5). The "supportability" of Dr. Schulman's opinions lends further weight to her opinions. See id. § 404.1527(c)(3). While the ALJ repeatedly characterizes Plaintiff's symptoms as "mild," he ignores that Dr. Schulman's records show that Plaintiff's symptoms never fully resolved after her severe flare in July 2015. Plaintiff's joint pain and stiffness persisted, requiring Dr. Schulman as well as Plaintiff's new rheumatologist, Dr. Budianu, to continually modify Plaintiff's medications in order to provide her with relief. (See, e.g., Admin. R. 481-82, 493-94, 507-08, 542-43, 549, ECF No. 7.) Even with the new medications, Plaintiff's symptoms continued into 2018. (See id. at 519, 542-43.) The "consistency" of Dr. Schulman's opinions with the record as a whole also merits additional weight being placed on her opinions. See 20 C.F.R. § 404.1527(c)(4). Dr. Schulman's diagnosis and treatment plan were consistent with those of Plaintiff's later treating physician, Dr. Budianu, as well as with Plaintiff's testimony.

Because Dr. Schulman's opinions were contradicted by other medical opinions in the record, those of Dr. Vu and Dr. Harris, the ALJ was required to articulate "specific and legitimate" reasons to reject the treating physician's opinions based on substantial evidence in the record. Lester, 81 F.3d at 830-31. He failed to do so. The ALJ's finding that Dr. Schulman's opinions were inconsistent with her own records and with those of

"another rheumatologist" (presumably Dr. Budianu) is not specific and legitimate. Although Plaintiff's clinical findings and symptoms certainly improved following her flare in July 2015, and thus became more "mild," they did not, as discussed above, ever fully resolve. "That a person . . . makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001). Notwithstanding Teresa P.'s "mild" symptoms, both Dr. Schulman and Dr. Budianu, specialists in handling rheumatoid arthritis, deemed it necessary to continue to prescribe new and increased dosages of medication to Plaintiff. The ALJ's reference to Plaintiff remaining "medication compliant" is misleading, because viewing the record as a whole, there is no indication that Plaintiff was anything other than diligent about taking her prescribed medications. The ALJ's statement that Teresa P.'s symptoms remained "mild" as long as she avoided "stressful exacerbations" in her life is similarly misleading, as the record is clear that it was the stress of her work that led to Plaintiff's most severe symptoms, and those symptoms gradually lessened after she stopped working. (See, e.g., Admin. R. 305, 307, 310, ECF No. 7.) As for the ALJ discounting Dr. Schulman's opinion that Plaintiff was unable to work on the basis that this is an issue reserved for the Commissioner, the regulations require the ALJ to "carefully consider medical source opinions about any issue, including opinions about issues at are reserved to the Commissioner." SSR 96-5P, 1996 WL 374183, at *2 (July 2, 1996).

In sum, the ALJ erred by failing to give sufficient weight to Dr. Schulman's opinions and by failing to articulate specific and legitimate reasons, based on substantial evidence in the record, to reject her opinions. "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981). The Court

recommends that this matter be remanded in order for the ALJ to provide due consideration to Dr. Schulman's opinions.

## 2. Dr. Lynch

Plaintiff provided the Appeals Council a September 21, 2018 medical report prepared by Dr. Lynch after the ALJ's July 17, 2018 decision. (See Admin. R. 1-4, 30-33, ECF No. 7.) Plaintiff contends that the Appeals Council improperly found that Dr. Lynch's report did not "show a reasonable probability that it would change the outcome" of the ALJ's decision. (Pl.'s Mem. 24-25, ECF No. 11.) Defendant argues that Dr. Lynch's evaluation is immaterial because it was not prepared until after the ALJ's decision. (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 15, ECF No. 12.)

The district court's function is to review the correctness of the Commissioner's decision at the time it was made. Hudson v. Bowen, 849 F.2d 433, 435 (9th Cir. 1988). A court may consider any additional materials submitted to the Appeals Council in conjunction with a claimant's request for review. Harman v. Apfel, 211 F.3d 1172, 1179-80 (9th Cir. 2000). Here, Dr. Lynch's report is consistent with Dr. Schulman's findings and therefore may bear upon the ALJ's evaluation of the record as a whole. Upon remand, the ALJ should evaluate this additional evidence. See id. at 1180 (remanding case to ALJ for consideration of additional evidence postdating the ALJ's decision).

## C. Plaintiff's Symptom Testimony

The parties disagree whether the ALJ properly evaluated Plaintiff's symptom testimony. Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for rejecting her testimony. (Pl.'s Mem. 25-28, ECF No. 11.) Defendant argues that the ALJ properly found that the medical evidence and Plaintiff's treatment history undermined the degree of limitations alleged. (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 17-19, ECF No. 12.)

An ALJ engages in a two-step analysis to determine the extent to which a claimant's report of symptoms must be credited. First, an ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (citing Garrison, 759 F.3d at 1014-15). In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptoms alleged; nor is she required to produce objective evidence of the pain or its severity. Id. (citing Garrison, 759 F.3d at 1014-15). If the claimant satisfies step one of the analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering "specific, clear and convincing reasons" for doing so. Id.

ALJ Levine determined that Teresa P. satisfied step one of the two-step analysis because her "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Admin. R. 47, ECF No. 7.) Nevertheless, he found Plaintiff's allegations of debilitating symptoms were "neither entirely consistent nor entirely supported by the evidence." (Id. at 50.) He observed that although Plaintiff testified that she has three flare-ups of rheumatoid arthritis per month, and reported this to her new rheumatologist (Dr. Budianu), her "longitudinal history of treatment does not support this allegation and there was no synovitis noted" by Dr. Budianu. (Id.) The ALJ further stated, "Likewise, she testified that she gets migraine headaches at least every two weeks, but this is not supported in the objective evidence of record." (Id. [exhibit references omitted].)

The clear and convincing standard is "not an easy requirement to meet" and is "the most demanding [standard] in Social Security cases." Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15). The Court finds that the ALJ did not articulate clear and convincing reasons to discount Plaintiff's testimony regarding the severity of her

20

symptoms.  Even after Plaintiff's condition "turned the corner" in January 2016, following her severe flare-up in July 2015, the medical evidence shows that Plaintiff continued to experience flares of her rheumatoid arthritis on a regular basis.  (See, e.g., Admin. R. 549 ["still having some flares of joint symptoms"]; 482 [limits daily activities due to joint pain]; 508 [medications not completely controlling symptoms]; 519 [noting that symptoms flared with weather changes], ECF No. 7.)  The record does not support the ALJ's finding that Plaintiff's longitudinal treatment history undermined her testimony that she experienced rheumatoid arthritis flare-ups three times a month.

Also, the absence of active synovitis observed during Dr. Budianu's examination, (see id. at 542), does not constitute a clear and convincing reason to discredit Plaintiff's subjective symptoms.  In discrediting Teresa P.'s testimony regarding the severity of her symptoms because one examination showed no active synovitis, the ALJ essentially required Plaintiff to provide objective medical evidence of her pain, which he is not permitted to do.  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (stating that an ALJ may not disregard a claimant's pain testimony solely because it is not substantiated affirmatively by objective medical evidence).  Additionally, the ALJ's finding disregards the chronic nature of rheumatoid arthritis.  In Salazar v. Astrue, 859 F.Supp.2d 1202 (D. Or. 2012), the district court, citing information from the American Arthritis Association, observed, "Rheumatoid arthritis is a chronic disease, meaning it can't be cured, and some people have intermittent symptoms or 'flares,' while others have ongoing symptoms that worsen over time."  Id. at 1227 (internal quotations and citation omitted).  The ALJ also discounted Plaintiff's subjective symptom testimony because he found that her statement that she gets migraine headaches every two weeks is not supported by the record.  (See Admin. R. 50, ECF No. 7.)  While this is a legitimate reason to discredit Teresa P.'s testimony, it does not, by itself, constitute a clear and convincing reason.

The Court recommends that Plaintiff's symptom testimony, upon remand, be reexamined after proper consideration has been given to her treating physicians' opinions, as discussed above.

**D.    Step-Four Analysis and Residual Functional Capacity**

Plaintiff contends that the ALJ erred in his formulation of her residual functional capacity ("RFC") by not including any functional limitations caused by her rheumatoid arthritis and migraine headaches.  (Pl.'s Mem. 8, ECF No. 11.)  She points out that her rheumatoid arthritis causes pain and swelling in her hands, wrists, arms, elbows, shoulders, knees, ankles, and feet, and she has arthritic flares three to four times per month that last three or four days.  (Id. at 8-9.)  She also gets migraines two to three times per month that require her to lie down for thirty to sixty minutes and which impact her ability to think and function for two days.  (Id. at 9.)  She argues that at a minimum, her RFC should have included handling and fingering limitations due to her wrist and hand impairments, her need for unscheduled work breaks or work absences when her flare-ups and migraines occur, and focus and concentration deficits due to pain and fatigue.  (Id. at 8.)  Teresa P. contends that as a result of her incomplete RFC, the ALJ further erred when he found that she was capable of performing her past work as a director of food services as this job is generally performed.  (Id. at 14-17.)  Defendant responds that the ALJ properly assessed Plaintiff's RFC and his finding at step four was proper.  (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 9-10, 15-17, ECF No. 12.)

Residual functional capacity is defined as "the most you can still do despite your limitations."  See 20 C.F.R. § 404.1545(a)(1) (2019).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, . . . mean[ing] 8 hours per day, for 5 days a week, or an equivalent work schedule."  SSR 96-8P, 1996 WL 374184, at *2 (July 2, 1996) (emphases omitted).  The RFC assessment is first used at step four of the

sequential evaluation process to decide if the claimant can perform her past relevant work.  20 C.F.R. § 404.1545(a)(5)(i).  If the ALJ decides that the claimant cannot perform her past relevant work, the same RFC assessment is used at step five of the sequential evaluation process to decide if the claimant can adjust to any other work that exists in the national economy.  Id. § 404.1545(a)(5)(ii).  In determining a claimant's RFC at steps four and five, the ALJ must consider all relevant evidence in the record, including medical history; medical signs and laboratory findings; lay evidence; the effects of treatment, including disruption to routine and side effects of medication; and the effects of symptoms, including pain.  SSR 96-8P, 1996 WL 374184, at *5; see also Robbins, 466 F.3d at 883 (9th Cir. 2006).

The RFC determination addresses both the remaining exertional and nonexertional capacities of the claimant.  SSR 96-8P, 1995 WL 374184, at *5.  "Exertional" capacities relate to an individual's physical strength and include the claimant's remaining abilities with respect to sitting, standing, walking, lifting, carrying, pushing, and pulling.  Id.  "Nonexertional" capacities do not depend on physical strength but rather assess the individual's remaining abilities in the following areas:  postural (e.g., stooping and climbing), manipulative (e.g., reaching and handling), visual (seeing), communicative (hearing and speaking), mental (e.g., understanding and remembering instructions and responding appropriately to supervision), and ability to tolerate environmental factors (e.g., tolerance of temperature extremes).  Id. at *6.  The determination of RFC is reserved to the Commissioner.  Id. § 404.1527(d)(2).  But the RFC assessment must always consider and address medical source opinions and, if the RFC conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.  SSR 96-8P, 1995 WL 374184, at *7.

Here, the ALJ found that Plaintiff has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567.  (Admin. R. 46, ECF No.

7.)  "Light work" is defined in this regulation as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b) (2019).  The ALJ summarized Teresa P.'s hearing testimony and treatment records, and then evaluated the medical opinions in the record, including those by Drs. Vu, Harris, and Schulman, regarding Plaintiff's impairment-related restrictions.  (Id. at 46-50.)  Again, Dr. Vu determined that Plaintiff had the RFC to lift or carry twenty pounds occasionally and ten pounds frequently; to stand, walk, or sit for six hours in an eight-hour workday; and was limited in her ability to push or pull with either both upper extremities or her right upper extremity.  (Id. at 95-96.)[11]  Dr. Vu also found that Teresa P. had postural and manipulative limitations, including a limitation in her handling and fingering abilities on the right side.  (Id. at 96-97.)  Dr. Harris adopted Dr. Vu's assessment.  (Id. at 107-09.)  The ALJ gave Dr. Vu's and Dr. Harris's opinions "some weight" because they supported a finding that Plaintiff can perform light work.  (Id. at 49.)  He did not, however, adopt their push and pull, postural, and manipulative limitations.

   The ALJ also evaluated opinions from Plaintiff's treating rheumatologist, Dr. Schulman, regarding Teresa P.'s impairment-related restrictions.  (Id.)  Dr. Schulman

---

[11] Dr. Vu's assessment regarding Plaintiff's push and pull limitations is ambiguous.  Dr. Vu stated that Plaintiff's ability to push and pull is limited in both upper extremities, but also appeared to indicate that Plaintiff could "frequently" push and pull with her right upper extremity.  (Admin. R. 96, ECF No. 7.)  It is unclear whether Dr. Vu intended to say that Plaintiff could frequently push and pull with her right upper extremity, or whether with frequent pushing and pulling, the limitations in her right upper extremity were more severe.

indicated on April 26, 2016, that Plaintiff could lift and carry less than ten pounds rarely, stand and walk less than two hours in an eight-hour workday, sit for about two out of eight hours, and would have to walk for five minutes every twenty minutes.  (Id. at 355-57.)  Dr. Schulman also opined that Teresa P. would be absent from work more than four times a month.  (Id. at 358.)  On November 13, 2015, April 20, 2017, January 18, 2018, Dr. Schulman completed forms conveying "similar restrictive assessments" of Plaintiff's work-related abilities.  (Id. at 50 [citing id. at 374-79, 382-84].)  As discussed above, the ALJ gave Dr. Schulman's opinions "little weight."  Plaintiff argues that the ALJ improperly relied on the opinions of the state agency nonexamining physicians, Dr. Vu and Dr. Harris, instead of crediting the opinions of her treating physician, Dr. Schulman. (Pl.'s Mem. 12-14, ECF No. 11.)  Teresa P. observes that while the ALJ adopted Dr. Vu's and Dr. Harris's findings that Plaintiff could perform light work, he erroneously omitted their findings that she had limitations in her pushing and pulling, postural, and manipulation activities.  (Id. at 13.)

The Court, as discussed above, agrees that the ALJ did not provide due consideration to Dr. Schulman's opinions.  The Court also finds that the ALJ erred by according the opinions of nonexamining physicians Vu and Harris more weight than those of Dr. Schulman.  Dr. Vu's and Dr. Harris's opinions did not constitute substantial evidence because neither of their opinions was based on independent clinical findings. Neither doctor offered a different diagnosis of Plaintiff's condition, and neither of their opinions was based on objective medical tests that Dr. Schulman did not consider.  See Orn, 495 F.3d at 632 ("When a [nontreating] physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the [nontreating] physicians are not 'substantial evidence.'"); see also Lester, 81 F.3d at 831 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of either an examining

physician or a treating physician.") (citation and emphasis omitted).  The ALJ further erred by omitting the push and pull, postural, and manipulative limitations set forth by Drs. Vu and Harris without explanation.  If the RFC formulated by the ALJ conflicts with an opinion from a medical source, he must explain why the opinion was not adopted.  SSR 96-8P, 1995 WL 374184, at *7.  ALJ Levine failed to do so here.

Judge Levine's finding that Plaintiff had the residual functional capacity to perform the full range of light work, and thus could perform her prior work as it is generally performed, is not supported by substantial evidence in the record.  He did not provide due consideration to Dr. Schulman's opinions, as discussed above, and the evaluation of Dr. Lynch's opinion as well as the reexamination of Plaintiff's subjective symptom testimony may impact the formulation of her RFC.  Moreover, the ALJ improperly failed to include the push and pull, postural, and manipulative limitations found by Drs. Vu and Harris without adequate explanation.  Therefore, Plaintiff's RFC, upon remand, should be reexamined.[12]

### III.   CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's motion for remand be **GRANTED IN PART** and **DENIED IN PART**, that Defendant's cross-motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**, and that the case be remanded for further proceedings.

This Report and Recommendation will be submitted to the Honorable Cathy A. Bencivengo, United States District Court Judge assigned to this case, pursuant to the

---

[12] As for Plaintiff's contention that limitations caused by her migraines should have been included in her RFC, the Court notes that in assessing a claimant's RFC, the ALJ is required to consider the limitations imposed by all of the claimant's impairments, including those that are not severe.  See SSR 96-8P, 1996 WL 374184, at *5; see also 20 C.F.R. § 404.1545(e).  Because Plaintiff's subjective-symptom testimony should be reevaluated on remand, the Court need not presently decide whether the ALJ erred by not including any migraine-related impairments in the RFC.

26

provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before <u>March 20, 2020</u>. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before <u>April 3, 2020</u>. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 27, 2020

Hon. Ruben B. Brooks
United States Magistrate Judge

19cv1321-CAB(RBB)